In the

# United States Court of Appeals
## For the Seventh Circuit
_____

No. 15-2061

DENG AREJ,

*Petitioner*,

*v.*

JEFF SESSIONS, Attorney General of the United States,

*Respondent*.

_____

Petition for Review of an Order of the
Board of Immigration Appeals.
No. A094-549-699.

_____

ARGUED MARCH 1, 2017 — DECIDED MARCH 28, 2017

_____

Before POSNER, SYKES, and HAMILTON, *Circuit Judges*.

POSNER, *Circuit Judge*. The Sudan is a very large region in northeastern Africa, the site of a number of ancient civilizations that flourished along the Nile. It became an independent nation in 1956 (before that it had been controlled by Britain and Egypt), but since 2011 it has accommodated two nations—the Republic of the Sudan and the Republic of South Sudan. Until 2011, when the southern half of the nation

broke away to form the Republic of South Sudan, the Sudan was the largest nation in Africa.

The population of the Republic of the Sudan is almost entirely Muslim, whereas most of the population of the Republic of South Sudan practices Christianity or African traditional religion. The religious difference between the two nations is germane to this immigration case, as we'll see.

The petitioner, Deng Arej, was born in South Sudan before it was an independent nation, and was sent as a child to live in the northern part of Sudan because his parents were afraid that if he remained in the south he'd be drafted into the south's army as a child soldier. When relocated to the north he concealed both his Christian faith and his southern ethnicity to avoid being killed by northern soldiers. Later, fearing that he would be drafted into the northern army, he fled to Egypt. He was admitted to the United States as a refugee in 2005. Though a native of South Sudan, now as we said an independent nation, he remains a citizen of the Republic of the Sudan.

Once in the United States, Arej committed a series of assaults (one in a fight that resulted in a death, although he was not convicted of murder) and was sentenced to two years in prison. In April 2014, after he completed his prison sentence, an immigration judge ordered him removed (i.e., deported) to the Republic of the Sudan. He might have preferred to be removed to South Sudan, now that it's an independent nation, as he is of South Sudanese origin and a Christian—but the record does not say which nation he prefers: probably, as we'll see, neither. There have been previous removals of Sudanese immigrants, but it is unclear how many of them were removed to the northern republic and

how many to the southern, and how many removed to one of the two countries moved or tried to move to the other.

In January 2015, awaiting removal more than eight months after having been ordered removed, Arej sought U.S. asylum on the ground that South Sudan (to which he may have intended to move from the Republic of the Sudan were he removed to that republic) was "increasingly volatile and dangerous" and by May 2014 on the brink of civil war. And as he wasn't even a citizen of the country, he might be unable to obtain protection from its government. He may have thought it obvious that he shouldn't be removed to the north either, in view of his vulnerability to persecution there, being Christian; in any event he was opposing, on plausible grounds, removal to either country.

He had missed the 90-day deadline for filing a motion to reopen the proceedings, however, which would have allowed him to petition for asylum. But he sought an exception to the deadline on the basis of changed circumstances since the issuance of the removal order. A civil war in South Sudan had broken out in December 2013 and by February 2015 a South Sudanese legal scholar was quoted in evidence that Arej submitted to the Board of Immigration Appeals as reporting that 20 percent of his country's population had been displaced and an "untold number" of them killed. Removed to the north, Arej would be in danger as a southerner, but if therefore he fled to the south, he would find himself in the midst of a civil war. He was between a rock and a hard place.

But the immigration judge denied Arej's motion to reopen (a motion that if granted would have made it possible for him to apply for asylum in the United States), remarking

that Arej "states no facts constituting changed circumstances." He appealed to the Board of Immigration Appeals, which however dismissed his appeal perfunctorily, remarking—inaccurately—that the fact that there was a "'[civil] war … in progress [in South Sudan]' … does not amount to a showing that circumstances have materially changed in Sudan or South Sudan since the time of the entry of the order of removal." That remark ignored the growing violence in the south during this period. Further ignoring evidence, the Board added that Arej had failed to present evidence that "establishes that, since the time of his ultimate removal hearing, conditions have materially changed in Sudan or South Sudan." That was incorrect; he had presented such evidence, which we summarized above.

Arej has conceded that he qualifies as a criminal alien under 8 U.S.C. § 1252(a)(2)(C), so our review of the Board's decision is limited to issues of law. 8 U.S.C. § 1252(a)(2)(D). But it was a serious legal error for the Board to have ignored Arej's evidence. As we noted in *Iglesias v. Mukasey*, 540 F.3d 528, 531 (7th Cir. 2008), the Board cannot make a reasoned decision to deny a motion to reopen if it ignores the evidence that a petitioner presents.

Furthermore, a competent immigration service would not ignore world events. The dramatically worsening conditions in South Sudan have been widely reported, with the young nation described as "cracking apart" and United Nations officials raising concerns about genocide. See, e.g., Jeffrey Gettleman, "War Consumes South Sudan, a Young Nation Cracking Apart," *New York Times*, March 4, 2017, https://nyti.ms/2lHeELw. "Tens of thousands of civilians have been killed"; "every major cease-fire that has been

painstakingly negotiated by African and Western officials has been violated"; and "dangerous fissures are opening up within the South Sudanese military." *Id*. And time doesn't stand still. The Board's order dismissing Arej's appeal from the immigration judge's denial of his motion to reopen was issued on May 8, 2015—almost two years ago. Considering that Arej has not yet been removed and that the order was perfunctory, the Board should consider whether he should be allowed to present evidence concerning *current* conditions in the two Sudans. See 8 C.F.R. § 1003.2(a).

The petition for review is therefore granted, the decision of the Board vacated, and the case remanded to the Board for further proceedings consistent with this opinion.

SYKES, *Circuit Judge*, concurring in the judgment. Deng Arej, a citizen of Sudan, was admitted to this country as a refugee in 2005 and thereafter committed multiple violent crimes in the State of Kentucky. Between December 2010 and May 2013, he was charged and convicted of these crimes in several separate state-court proceedings and was sentenced to serve short concurrent prison terms. The Department of Homeland Security thereafter initiated proceedings to remove him from this country. His serious criminal conduct made him removable on several grounds. *See* 8 U.S.C. § 1227(a)(2)(A)(ii) (making aliens removable for committing a crime of moral turpitude); *id.* § 1227(a)(2)(E)(i) (making aliens removable for committing a crime of domestic violence); *id.* § 1227(a)(2)(A)(iii) (making aliens removable for committing an aggravated felony).

During the removal proceedings, Arej declined the opportunity to apply for asylum, withholding of removal, or deferral of removal under the Convention Against Torture. On April 23, 2014, an immigration judge ordered him removed to Sudan. Arej waived his right to appeal the removal order to the Board of Immigration Appeals ("BIA" or "the Board").

On January 9, 2015—more than eight months later—Arej moved to reopen the removal proceedings, saying that he now wished to apply for asylum "in the interest of justice and humanitarian concerns." A motion to reopen must be filed within 90 days of the entry of the order of removal, *id.* § 1229a(c)(7)(C)(i), so his motion was untimely by more than five months. An exception to the time bar exists if the alien can demonstrate that conditions in the country to which he has been ordered removed have materially changed since

the removal order was entered. *Id.* § 1229a(c)(7)(C)(ii). Arej submitted no evidence and otherwise made no effort to fit his case within this exception, so the immigration judge denied the motion as untimely.

Arej appealed to the BIA and this time submitted documentary evidence in an effort to show a material change in country conditions in the Sudan and South Sudan. The Board rejected his argument and dismissed the appeal. Its dismissal order refers in general terms to the "numerous documents" Arej submitted on appeal and summarily concludes that this "additional evidence" failed to establish that conditions "materially changed in Sudan or South Sudan" since the removal order was entered. The Board also concluded "upon consideration of the totality of the record" that sua sponte reopening was unwarranted.

Arej petitioned for review, but our jurisdiction is severely limited by his status as a criminal alien; we do not have authority to review the BIA's decision for abuse of discretion. More specifically, the Immigration and Nationality Act ("INA") provides that "no court shall have jurisdiction to review any final order of removal against an alien who is removable by reason of having committed a criminal offense covered in … section 1227." *Id.* § 1252(a)(2)(C). Without jurisdiction to review the underlying removal order, we also lack jurisdiction to review the denial of a motion to reopen that order. *Cruz-Mayaho v. Holder*, 698 F.3d 574, 577 (7th Cir. 2012). But the INA preserves our jurisdiction to review questions of law and constitutional claims. 8 U.S.C. § 1252(a)(2)(D). Accordingly, we lack jurisdiction to review how the BIA evaluated and weighed Arej's evidence or to

test its decision for abuse of discretion; we may review its decision only for errors of law and constitutional infirmities.

My colleagues address jurisdiction only fleetingly, though they do cite § 1252(a)(2)(D) and *Iglesias v. Mukasey*, 540 F.3d 528 (7th Cir. 2008). *Iglesias* holds that when an alien asserts that the BIA "completely ignored the evidence he presented," he has raised "a good faith claim of legal error" that counts as "a question of law" under § 1252(a)(2)(D). *Id.* at 531. Relying on *Iglegias*, my colleagues conclude that the Board ignored Arej's evidence. Majority Op. at p. 4. That's incorrect.

The dismissal order is admittedly a brief summary disposition, but it's clear that the Board was aware of the additional evidence Arej submitted on appeal. The Board acknowledged in general terms that Arej submitted "numerous documents" on appeal and ruled that this "additional evidence" is insufficient to show changed country conditions. The order also specifically states that the Board considered the "totality of the record" in declining to reopen sua sponte. That's more than the BIA said in *Iglesias*; the order denying reopening in that case contained not a word about the alien's evidence. 540 F.3d at 531–32.

Still, other language in *Iglesias* suggests that Arej has indeed raised a colorable claim of legal error, though it's very narrow. Our opinion in *Iglesias* listed in summary fashion the key items of evidence the petitioner had presented to the BIA in his appeal. *Id.* at 532. We then say this: "Had the BIA at least mentioned this evidence, we could have some confidence that these materials had been considered. Unfortunately, the brevity of the decision leaves us with the impression that the BIA committed legal error … ." *Id.* at 532. This

suggests to me that it's a legal error under *Iglesias* for the Board to deny a motion to reopen with a generic assurance that it has considered the "totality of the record," as it did here. We have limited jurisdiction to correct that legal error, but not to look for factual errors or an abuse of discretion.

In *Iglesias* we ultimately denied the alien's petition for review, finding the legal error harmless. 540 F.3d at 532–33. The government has not raised harmless error here, so that argument is waived.

Accordingly, I agree with the court's decision to vacate the BIA's order and remand for further proceedings, but I arrive at that conclusion on narrower grounds. I respectfully concur in the judgment only.